Riegel & Co., Inc., *v.* Philadelphia, Appellant.

Argued January 30, 1929. Before FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*James Francis Ryan,* with him *G. Coe Farrier,* Assistant City Solicitor, and *Augustus Trask Ashton,* City Solicitor, for appellant.—The testimony as to prior leaks which did no damage to plaintiff is not admissible unless it is properly connected with the bursting of the large main by testimony which would show notice to the city of a defect in the main or of a danger to the main.

The evidence does not show negligence on the part of defendant in that no notice is shown of conditions which would naturally result in the break of the main or that would cause those having knowledge and experience in the matter to anticipate that there would be a break in the main and the city did everything reasonably required of it under the circumstances: Morgan v. Boro., 29 Pa. Superior Ct. 100; Abraham v. Yardum, 64 Pa. Superior Ct. 225.

*Leon J. Obermayer* of *Edmonds, Obermayer & Rebmann,* with him *J. Warren Brock* and *David F. Maxwell,*

258

for appellee.—The lower court properly denied defendant's motion to strike out all testimony relating to the leakage of water prior to the break in the large main: Zimmer v. Phila., 57 Pa. Superior Ct. 20; Schwindt v. Water Co., 33 Pa. Superior Ct. 23; Hartman v. Gas Co., 210 Pa. 19; Rumsey v. Phila., 171 Pa. 63.

The lower court properly submitted the case to the jury, and denied defendant's motion for judgment n. o. v. because there was evidence that the break in the main was the result of defendant's negligence in the inspection, repair, maintenance, and construction of the main: Rumsey v. Phila., 171 Pa. 63; Ottersbach v. Phila., 161 Pa. 111; Heh v. Gas Co., 201 Pa. 443; Morgan v. Boro., 29 Pa. Superior Ct. 100; Koelsch v. Phila., 152 Pa. 355.

The lower court committed no reversible error in permitting plaintiff's expert, on rebuttal, to testify that water flowing under the main would cause the main to settle unevenly and to rupture at its weakest point.

OPINION BY MR. JUSTICE SCHAFFER, April 15, 1929:

The thirty-six inch express water main of the City of Philadelphia laid by it under the surface of Seventh Street burst about three o'clock in the morning of September 3, 1926, and poured great quantities of water into the cellar of a building occupied by plaintiff, damaging a stock of paper goods which it had stored therein. This action was brought to recover compensation for the loss and resulted in a verdict in its favor for $17,128.79, upon which judgment was entered. Defendant thereupon took this appeal, contending that plaintiff has not shown a state of facts which under the law entitled it to recover.

The city's first and main position is that there is no proof of any notice to it of any flow of water from the main prior to its bursting or of anything in connection with it, such as depressions in the street surface or a sinking thereof, which would convey information to it that there was anything the matter with the main, and

that the testimony which was received as to previous leaks in the street not shown to have come from the main in question was improperly admitted and should have been stricken from the record.

The second position assumed by the city is that even with the testimony as to prior leakage in the street upon the record, when it showed by uncontradicted testimony that the supports upon which the burst pipe rested, the remainder of the broken section and the earth beneath it were not disturbed and had not sunk and that the supports were still in alignment and that the pipe was capable of withstanding its internal pressure without external support, an expert witness called by plaintiff who had not seen the pipe should not have been permitted, after defendant had finished its evidence, to testify over objection that water running under the pipe would cause the surrounding earth to wash away and the pipe to sink and settle so that it would break.

The city's third position is closely related to its first and is in substance that it is not responsible if a large express water main bursts without other warning than the existence of several small leaks from other pipes (whether from other pipes or the main itself is the critical inquiry in the case) in the immediate vicinity where there is no subsidence of surface and nothing to indicate anything wrong with the main and the break is proved to have been an instantaneous and complete rupture not preceded by any certainly established leakage from the main.

We will not treat each of these propositions separately for the reason that they run into and dovetail with each other and can be best and most satisfactorily covered by a discussion of the case at large, wherein a comprehensive picture of the whole controversy and all the facts and inferences arising therefrom can be made to appear. The following is the way the case was laid before us on oral argument, where on both sides the presentation was able and complete:

The portion of the main in front of plaintiff's building had been laid during July and August, 1925. In the early part of January, 1926, after it had been in use for a few months, and eight months before it burst, water began to escape into the basement of a building diagonally across the street from the one occupied by plaintiff. The engineer of the building immediately notified defendant's water department of the leakage and that in his opinion it was from the new main. The flow of water finally caused him to install a steam syphon in the basement of the building to syphon it out onto the street. No water had leaked into the basement before January, 1926, and none after the break in the pipe which we are considering had been repaired.

Four or five months prior to September 3, 1926, when the main broke, water from the street in amount equivalent to the flow from an ordinary hydrant began to escape into the basement of the premises next to those of plaintiff. The city was notified of this condition in March or April by telephone and by letter. In August the volume of water began to increase and the occupant of the building notified the city that the leak was increasing and that in his opinion it was becoming dangerous and that he believed it was from the main and called upon the city to send some one to look into the matter. The leak continued to grow in volume until the main burst. After it was repaired, the water ceased to escape into this building; none had run into it before the main was put in use.

About August 20, 1926, water from the street began to run into plaintiff's building and continued to do so in increasing amounts until the main burst. The flow was sufficient to fill a pit six feet square by ten or twelve feet deep twice a day. The city was notified of the conditions daily from the time the leak began on August 20th until the main burst. The attorney for the owners of the building on August 24th wrote to the chief of the water bureau saying that a serious leak in the water

pipe had developed in front of it which was causing damage which threatened to increase rapidly, to which he received a reply dated October 7, 1926, more than a month after the main burst, saying that a repair crew had excavated and found a leak on an abandoned service, the ferule of which was drawn. Water continued to leak into the building until the main burst; after it was repaired none did.

In February, 1926, an experienced plumber, in making repairs at the adjoining property, uncovered the large main and found a stream of water equivalent to that from a $1\frac{1}{4}$ inch pipe flowing underneath it.

Defendant, so far as the proofs disclose, did nothing in pursuance of the numerous complaints until August 25th, when some of its repair men arrived on the scene and between that date and August 28th made some attempts to locate the source of the leak. They found and repaired a leaking ferule at the corner of 7th and Arch Streets more than half a block from plaintiff's property. The leaking water from this source, however, was not escaping into the bed of the street but was running through the electric conduits laid therein. The stopping of this leak did not diminish the flow of water into plaintiff's building or into any of the others. During the entire time that the repair men were engaged in trying to locate the source of the escaping water they did not make any inspection of the large main, indeed, no examination of it was made at any time after the leaks began to manifest themselves until it burst. On August 28th the repair crew was withdrawn and sent to another job, although they had not succeeded in finding the source of the escaping water, and for the six days preceding the bursting of the main, the city did nothing. After the main burst and while the city was repairing the break, discovery was made that water was escaping from a ferule located about twelve feet from the break. There was no evidence to show when it began to leak, whether before or after the break. From the havoc which

was caused in the street by the flood which poured out, sixteen tons of water a second from the broken main, it might well have begun to leak then. We think it manifest from the evidence that this leak and the one at 7th and Arch Streets were not the sources from which the water flowed into plaintiff's and other buildings prior to the break.

It was shown that the main was constructed of sections of pipe twelve feet in length. One end of each section is bell-shaped, into which the plain end of the next section is fitted. The joint is then packed with oakum or jute and caulked with hot lead, to permit of flexibility to take care of settlement, expansion and contraction. Each section of pipe was supported by wooden blocks, one under its bell and the other under its middle. In rebuttal, an experienced hydraulic and mining engineer called by plaintiff testified that it was not good engineering practice to support each section of pipe by a block under its middle because, if supported only at the ends, the flexibility of the joints would take care of any strain resulting from inevitable settlement, but if supported at the middle this would not take place. He said further that water flowing underneath the main would wash away or soften the earth beneath, causing it to settle unevenly, which would cause the pipe to rupture. This last statement was coincided in by defendant's expert witnesses.

Defendant's case consisted of proof that the main had been properly constructed of good materials and had been subjected to proper and adequate tests and of the testimony of experts, who said that the break in the main was instantaneous and that it had not suddenly given way at a place from which water had been escaping prior to the break. The opinion of these experts was that the edges of the pipe about the hole and the edges of the pieces which broke out were not rusty or worn smooth by the friction of the escaping water as would have been the case had water been escaping from the main prior

to the break. It was not shown, however, how long water would have to continue to escape from a crack in the main before the edges would become rusty or smooth. It appeared that the break was not due to a latent defect and the experts said they did not know what had caused it.

We are of opinion that there was sufficient notice given to the city prior to the break to put it upon investigation of all the possible sources of water leakage in the street, including the large main, to which its attention as a likely cause of the trouble was specifically directed by some of the complaints. It made no examination whatever of the large main. The leaking began shortly after it was installed; it ceased after the break was repaired. As has been noted, the broken ferules could not have been the seat of the trouble. After the first one of them was located and repaired, the volume of escaping water, instead of diminishing, increased. We are impressed with the circumstance that when the city finally sent a repair crew to look into the situation, when it had become increasingly menacing, sufficiently so to call for a letter of warning from the attorney of the owners of the buildings affected, after making some ineffectual attempts to discover the source of the leakage, they abandoned the quest on August 28th, six days before the pipe burst, and in that interval did nothing. The city had ample notice that there was a leak in the street from its water system. In the light of the notices received, it was its duty to investigate all its water pipes in the street until the source was found. As was said in Rumsey v. Phila., 171 Pa. 63, 65, "Whether the efforts to locate and stop the leak were prosecuted with due diligence or were negligently conducted was a pure question of fact which was necessarily submitted to the jury."

In Allied Realty Co. v. Phila., 95 Pa. Superior Ct. 62, where the cause of action was the same as here, the Superior Court decided there could be no recovery. It is sufficient to say that the facts there shown were not

the same as were established in the instant case. Judge GAWTHROP, in the opinion, remarked, "If there had been any evidence to support the inference that the defendant ought to have suspected that the water which was running into plaintiff's cellar prior to the break in the main was coming from it, the case would present a different aspect." In the pending case, we think the grounds for suspicion were strong; not only so, but the city had the main specifically pointed to as the source from which the water came. Way, the engineer of the building which plaintiff occupied, told one of the city's inspectors that he thought the water was escaping from the main because more appeared at night than by day. Seeds, the owner of the next door building, told the chief clerk of the water bureau, that the water came from the main and the engineer of the building on the opposite side of the street similarly informed the water department. There was no such evidence in the record before the Superior Court. The city should have known that such an amount of water as the plumber testified to, a stream equivalent to the flow from a $1\frac{1}{4}$ inch pipe, could not have come from the $\frac{1}{2}$ inch ferule. The volume of water passing from pipes of different sizes varies as the squares of the respective diameters. Consequently the volume of escaping water which this witness saw was over six times as great as could have escaped from the $\frac{1}{2}$ inch ferule.

Our review of the entire record has convinced us that the case was for the jury and that no reversible error appears. If authority were needed to sustain the recovery, it could be found in Kibele v. Phila., 105 Pa. 41; Ottersbach v. Phila., 161 Pa. 111; Rumsey v. Phila., 171 Pa. 63; Hey v. Consolidated Gas Co., 201 Pa. 443; Hartman v. Citizens Natural Gas Co., 210 Pa. 19; Schwindt v. Lehigh Water Co., 33 Pa. Superior Ct. 23; Zimmer v. Phila., 57 Pa. Superior Ct. 20.

The judgment is affirmed.